**Isabelle STEVENSON, John A. Stevenson and Laura H. Stevenson, Plaintiffs,**

v.

**The PENNSYLVANIA RAILROAD COMPANY, Defendant.**

**No. 66 Civ. 1837.**

United States District Court
S. D. New York.

Oct. 23, 1968.

---

Emile Z. Berman and A. Harold Frost, New York City, for plaintiffs; Émile Z. Berman, Marvin Ausubel, New York City, of counsel.

Conboy, Hewitt, O'Brien & Boardman, New York City, for defendant; David J. Mountan, Jr., New York City, of counsel.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEINFELD, District Judge.

Upon all the evidence, I find that the plaintiffs have sustained their burden of proof that the defendant was negligent. I accept the testimony of James F. Higgins as credible and truthful. Higgins, an employee of the New York, New Haven and Hartford Railroad, was walking some six or seven feet behind Robert Johnson, Jr., the defendant's baggage porter, and clearly saw the events which resulted in the accident. Higgins testified that Johnson pushed his empty baggage truck forward close to the very edge of the platform on the Track 12 side, where Train 175 was entering the station; that no other person had any contact with the truck; and that Johnson gave no signal or warning to the oncoming crowd of passengers then disembarking from the train at

Track 11. Johnson was negligent in pushing the truck close to the edge of the platform, as a result of which it was struck by the grab iron of the moving train on Track 12, propelling the truck with great force against the plaintiff, causing her to sustain serious injuries. Johnson was further negligent in failing, at all times, to have the hand truck under his control.

And even if Johnson's testimony were accepted that passengers with luggage had brushed against the truck, so that it was pushed against the grab iron, the defendant was negligent. Johnson testified that he knew the platform which served Tracks 11 and 12 would be crowded with disembarking passengers; as he put it, he could expect a "Sunday crowd"; furthermore, this Sunday was at the end of a holiday weekend. The distance between the side of the baggage elevator and the edge of the platform at Track 12 was four feet, one inch. The grab iron projected two inches from the train. Due to reconstruction over the Pennsylvania Station, the platform adjacent to Track 11 was wet with water pouring down from the open area above. The pouring water forced the passengers disembarking from the train on Track 11, as well as Johnson himself, to use the restricted space between the baggage elevator and the edge of the platform at Track 12. The narrow passage there became even more restricted by the use of the hand truck, which was two feet, three inches wide, and four feet, nine and one-half inches long. The truck, with a fixed wheel on each side, and two swivel wheels, one at the front and the other at the back, pivoted easily.

It was reasonably foreseeable, under the prevailing conditions, that the surging crowds of passengers disembarking from the train at Track 11 would use the restricted area between the baggage elevator and the edge of the platform at Track 12, and that any further limitation of the already restricted space by the use there of the baggage truck would result in passengers with luggage brushing or being pushed against the truck, thereby creating a condition of danger to the passengers, just as occurred in this instance. Under the circumstances, it was negligent, even reckless, conduct to push a baggage truck against the current of oncoming passengers, particularly in the absence of a guard or policeman to direct or control the crowds. In fact, Johnson had been instructed not to use a hand truck when the station was congested, and a safety rule required him to keep a safe distance from the passing trains.[1] He failed to observe the instruction, and he violated the rule. In sum, the defendant breached its duty to provide the plaintiff Isabelle Stevenson with a safe means of egress from the railroad platform.[2]

■ The accident happened on February 13. The truck was propelled against plaintiff with great force. She sustained bilateral compound comminuted fractures of both legs. She bled so profusely from open wounds on both legs while awaiting removal to a hospital that a bystander applied tourniquets to save her from dire consequences. Plaintiff was first taken to St. Vincent's Hospital, where compression bandages and emergency splints were applied to both legs. Later that day she was removed to St. Clare's Hospital in neurogenic shock. There emergency major surgery was performed on both legs following x-ray examinations. The x-rays of the right leg revealed a severely comminuted fracture of the tibia in the distal one third; also fractures in the distal tibia in the medial malleolus and in

1. Cf. Tennant v. Peoria & P. U. Ry., 321 U.S. 29, 33, 64 S.Ct. 409, 88 L.Ed. 520 (1944); Dundom v. New York Cent. R. Co., 145 F.2d 711, 712 (2d Cir. 1944); Danbois v. New York Cent. R.R., 12 N.Y.2d 234, 238 N.Y.S.2d 921, 189 N.E.2d 468 (1963).

2. Williams v. Long Island R.R., 294 N.Y. 318, 320, 62 N.E.2d 212 (1945). The cases relied upon by the defendant are clearly inapposite. In each instance no act or conduct on the part of any employee of the defendant played any part in the accident.

the distal fibula. The x-rays of the left leg revealed a transverse comminuted fracture of the tibia with considerable displacement; also the left ankle was shattered. In addition to the fractures, there were open gaping wounds in both legs exposing extensor muscles and tendons in which bone fragments were interlocked. Manipulative reductions of the fractures were effected and extensive debridement performed. Plaster of Paris casts were applied to both legs, extending from the base of the toes to the upper thighs, with the knees flexed and the feet at right angles.

Plaintiff's condition required numerous blood transfusions. Following the operation, due to her life-threatened condition, she was placed in the intensive care unit, where she remained until February 21, when she was removed to a private room attended by private nurses. It was necessary to turn her from side to side with the plaster boots maintained in a fixed position by a circumferential strap about the ankles. She was discharged from the hospital on March 19 for home care under the supervision of nurses and was there examined from time to time by her doctor.

Plaintiff returned to the hospital on April 11 for treatment of a condition of serum hepatitis, which her doctors, including a specialist, concluded had been acquired as the result of the blood transfusions. She remained there until April 26, when she was again discharged for home care under the supervision of nurses. There were several readmissions to the hospital for changes and final removal of the casts.

Plaintiff's legs were encased in the casts from February 13 to the end of July, 1966, following which she wore a special brace. She also required the use of a wheelchair and the aid of crutches. She wore the brace until February, 1967, a year after the accident. As late as May, 1967, she still required cane support. Plaintiff received extensive physical therapy treatments, which included gait training, in addition to massages and underwater and other exercises.

Plaintiff sustained a permanent twenty-five degree bowing of both legs, which are misshapen and permanently scarred. The right leg has a scar five inches by three inches on the outer side, and an inner scar of four inches bound down to soft tissue. There is a neuroma, a serious nerve involvement, in her right leg due to damage to a nerve which was lacerated by the fracture. The doctor testified the neuroma could be dealt with by surgery, but there was the risk of numbness in the lower right foot. Her orthopedic surgeon advised against corrective surgery for the bowing of the legs in view of the history of serum hepatitis and the severe nature of the operation.

Prior to the accident, plaintiff enjoyed good health; she was agile, physically fit and active. At the time of its occurrence, plaintiff was 51 years of age and had been married for more than twenty-five years and was the mother of two children. Prior to her marriage she had been a dancer, and had, as her husband testified, very attractive legs. She had performed before royalty and had danced at the Palace, New York City. Following her marriage, and after the birth of her children, she remained physically fit, with continued agility and was able to do cartwheels, which she did as recently as a month before the accident. Apart from the deformity of the bowed legs, the injuries have permanently impaired her agility and walking capacity, which are greatly restricted. She can walk only short distances, whereas previously she was able to, and did, walk prolonged distances; she still has difficulty in climbing stairs; also difficulty in rising from a resting or sitting position.

Plaintiff also has had to forego other activities. Following her marriage, she became an editor in her husband's book publishing company, which activity she continued to the date of the accident. She was active in civic and community

groups and participated with her husband in social events; these, by reason of her restricted physical capacity, have been much reduced.

As to pain and suffering, there can be no doubt that the nature of the injuries caused plaintiff severe and excruciating pain over an extended period. In 1968 there is still sensitivity in the area of the skin grafting, a tingling sensation along the right leg and recurrent stiffness and aching in both feet and ankles.

Considering the nature and extent of plaintiff's injuries, their permanency, the pain and suffering she has experienced to date, and that she is likely to experience in the future, her mental anguish caused by the distorting nature of some of the permanent injuries,[3] the Court awards to plaintiff Isabelle Stevenson the sum of $100,000.

The husband, in addition to reimbursement for hospital and medical expenses incurred in connection with the wife's injuries, is also entitled to an award for loss of services and consortium.[4] The hospital, medical, nurses' and related bills total $29,777, of which sum the defendant challenges a portion of the nurses' expenditures of $10,839 upon the ground that practical rather than registered nurses could have served the injured's purposes just as well. I am inclined to agree that during the period that Mrs. Stevenson was confined to her home in a hospital bed, a practical nurse could have attended to her needs and carried out the doctor's orders. While precise figures have not been submitted as to the differential in pay, taking into account an acknowledged difference and an appropriate period, $2500 should be deducted. Although the defendant does not dispute that the orthopedic surgeon was paid the amount for which reimbursement is sought and which he testified was reasonable, the defendant has

offered no counter evidence. The Court finds that this charge was reasonable. Accordingly, the total amount allowed for hospital, medical and other expenses after the above deduction is $27,277.

The evidence indicates that the conjugal relationship of the Stevensons was close and that together they engaged in many activities, which were considerably curtailed and are likely to remain curtailed over a substantial period. The Court allows for all elements constituting loss of consortium the sum of $10,000.

The plaintiff Isabelle Stevenson is entitled to judgment in the sum of $100,000, and the plaintiff John Stevenson is entitled to judgment in the sum of $37,277.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

3. Cf. Ferrara v. Galluchio, 5 N.Y.2d 16, 19, 176 N.Y.S.2d 996, 998, 152 N.E.2d 249, 251 (1958).

4. Butler v. Manhattan Ry. Co., 143 N.Y. 417, 38 N.E. 454 (1894); cf. Millington v. Southeastern Elevator Co., 22 N.Y.2d 498, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968).